The next case on the call this morning is Docket Number 123123, LMP Services v. The City of Chicago, Agenda Number 10. Mr. Cromer, if you're ready, you may proceed. Thank you, and may it please the Court. My name is Robert Cromer, and I represent Appellate LMP Services. Chicago's 200-foot rule bans food trucks from operating on public or private property within 200 feet of restaurants. It does so for the express purpose of restricting competition. And to enforce the rule, Chicago requires food trucks to install GPS tracking devices that let it follow their every move. These actions violate the Illinois Constitution. For a century and a half, this Court has held anti-competitive purposes illegitimate, including when it held Lombard's 650-foot rule unconstitutional in Chicago's Federal Trust. The hold that the government may restrict competition to protect entrenched lobbying groups would require overruling Chicago's Federal Trust. It would make Illinois a constitutional outlier, and it would turn the right to practice one's trade into a death letter, since governments would always claim that their friends are important, too, and deserve similar protection. Although Chicago forces food trucks to install GPS devices, the Appellate Court held it wasn't a search for constitutional purposes because it was a condition of licensure. That holding is incorrect and would diminish the privacy of thousands of licensees statewide. Because GPS tracking is a warrantless search, Chicago must prove it's reasonable. Although GPS schemes can be constitutional, this one is not. Its principal purpose, enforcing the 200-foot rule, is illegitimate. It's unnecessary, and its plain language allows GPS data to be shared with anyone who asks. Now, turning to my first argument... Does the amendment change that? Excuse me? Does the amendment change the analysis on that? The recent regulatory amendment changes nothing, Your Honor, because the plain language of the statute, of the ordinance, makes clear that it is a publicly accessible application programming interface. And as this Court held in King v. Walmart, when an administrative regulation is inconsistent with the statute, it's invalid. That's what we have here. We have a regulation that is saying the ordinance says X, and the regulation says not X. It says the exact opposite. Because the plain language controls, Your Honor, that point still stands. Now, I was going to begin with the 200-foot rule, Your Honors. Chicago admits the 200-foot rule burdens vendors to protect restaurants from competition. This is fatal. For 150 years, Illinois courts have held that the police power may not be used for anti-competitive ends. Chicago Title and Trust is directly on point. Just as Chicago blocks food trucks from being within 200 feet of restaurants, whether on public or private property, Lombard blocked new gas stations from being within 650 feet of existing stations. This Court... Didn't the Lombard Court find that it was unconstitutional because the stated reason for the 650-foot rule was safety, but there were stations within 150 feet of schools, hospitals, and other places. So the stated reason seemed to be bogus? That's exactly right, Your Honor. What they did is this Court went through the evidence, recognized that Lombard's proximity restriction did not further Lombard's pretextual arguments about safety and traffic. And what it said there is that with all those cast aside, what is clearly going on here is an attempt by the local government to legislate economic protection for existing businesses by hobbling newcomers. And this Court said that lacked a rational basis, furthered no legitimate government interest, and declared it unconstitutional. So here you're arguing that it's to protect the fixed stand-alone restaurants from competition. We're to examine this under the rational basis, I believe you would agree, as to whether it's constitutional? Yes, Your Honor. Do we disregard the other reasons given by the city for the rational reason for the rule, congestion on the sidewalks, other things, safety, and that type of thing? No, I believe what this Court can do, consistent with Chicago Title and Trust's examinations, the record evidence demonstrates that the law does not rationally further either of the pretextual objectives that the city's put forward. But here, the city has admitted that this rule exists to protect competition. And so in Chicago Title and Trust, when that became apparent, this Court reversed. And likewise, in Lazarus v. Village of Northbrook, this Court declared that Northbrook couldn't block a new hospital in order to protect financially benefit existing hospitals. And in Church v. State and People v. Brown, this Court struck down licensing schemes that shut the door to new competitors. Now, despite this long history, Chicago and the Illinois Restaurant Association claim the city may discriminate against food trucks in order to financially benefit an entrenched interest group that politicians in the city deem more important. But this is wrong. In every case the city cites, the Illinois courts upheld laws that were passed for the express purpose of directly benefiting the public. By contrast, this law is admittedly for the direct purpose of, explicit goal of discriminating against food trucks to directly benefit the Illinois Restaurant Association and its members with the argument that those financial rewards may incidentally trickle down to the public. But this Court has never upheld a law on such a basis. In fact, it's rejected that reasoning. In Southwestern Illinois Development Authority, or SPIDA, the government wanted to seize an auto recycler's property so that a nearby racetrack could expand. The government argued that although the racetrack would be the primary beneficiary of the transfer, the public might incidentally benefit through a trickle-down process of high economic growth. But this Court held that such economic byproducts could not justify depriving the recycler of his constitutional rights. This Court should follow the decisions of Chicago Talent and Trust and SPIDA to hold that Chicago may not hobble food trucks in order to financially benefit restaurants out of this idea that such benefits might incidentally trickle down to the public. The city says they're protecting the tax base and pedestrian traffic control. Excuse me, Your Honor? Isn't the city saying that they're protecting the tax base and pedestrian traffic control? Well, they have made those arguments, but this is blatant protectionism, Your Honor, and that kind of incidental public benefit has never been justified in law. In fact, state Supreme Courts, other state Supreme Courts, have explicitly rejected those precise arguments. In the Good Humor Corporation v. City of New York, New York City made the exact same argument. It said, we're not suppressing vendors as an end in itself or to directly benefit their economic competitors, but we want to prevent unfair competition with storekeepers who pay rent and various taxes. And they said that likewise, just as Chicago did, this won't redound just to the benefit of the restaurants, but it will benefit the city and its inhabitants. The New York Court of Appeals struck that law down, said it was unconstitutional. The New Jersey Supreme Court, as well, has held that this concept of maintaining tax receipts cannot justify blatant discrimination against one party for the direct financial benefit of another. What about our case of Napleton v. The Village of Hensdale? Napleton, respectfully, has no bearing on this case, Your Honor. One thing that's important to note is that it's never been cited for this protectionism argument until the appellate court's decision. More importantly, when you look at that case, it has nothing to do with protectionism at all. In that case, Napleton was doing zoning work, and it wanted to maintain, make decisions about whether banks could go in certain areas or not. It was doing this for the public's benefit, the overall public benefit. It wasn't an example where, in that case, Ms. Napleton wanted to run a bank. And it was a situation where Napleton was acting to directly benefit existing banks by preventing new competitors from entering the market. That is fundamentally different than what we have here, where the city has admitted that its actions are meant to directly affect competition, to directly benefit restaurants by hobbling their mobile competitors. And the idea is that there's going to be some incidental benefits that trickle down to the public. But, as I mentioned, other state Supreme Courts have rejected that. And, of course, that same argument could have been made in any of the cases where this court struck down unconstitutional anti-competitive restrictions. The same could have been said about the existing hospitals in Lazarus or the existing gas stations in Chicago, Tylen Trust. The problem with that argument, though, is that once it becomes open, if you hold that Chicago may restrict vendors based on these imagined incidental benefits, it wouldn't just require overruling Tylen Trust, but the principle of law at that point would have no bound. No matter the industry, officials could hobble newcomers to protect entrenched existing groups who they claimed were important, too. And under the rational basis test, this court would have to accept those legislative judgments. The constitutional right to practice your trade at that point would be no better than your ability to curry favor with someone at City Hall. Now, going back to the previous point about Swida, Swida already says that this trickle-down argument can't justify depriving someone of their constitutional rights. But isn't Swida distinguishable? I mean, it was an eminent domain case. Well, it is, Your Honor. But it also talks of, if you look at the decision in Swida, it talks about the use of the police power to be able to, as part of justifying the taking of this case. Is this within the police power? Is this a public use? And so I understand that it comes up under a different section of the Constitution, but the principle still holds that in that case, incidental trickle-down byproducts couldn't justify depriving the rate of the recycler of his constitutional rights. And I would say the same here. Indeed, Chicago's argument is on an even weaker footing than the argument that this were rejected in Swida, because there the racetrack would have likely improved the broader economy. But it's important to recognize here that Chicago's speculation that competition is going to somehow lead to these deleterious effects that have been spread across the entire city is contradicted by the real-world evidence of New York City, Los Angeles, Washington, D.C., all of which have vibrant restaurant and vending industries without any kind of anti-competitive rule like the 200-foot rule. Mr. Frommer, is it true that the commissaries that each one of the vendors has does pay property tax and contributes? Yes, Your Honor, it is true. And that's part of the problem. The city wants to make it out to be that restaurants pay all the tax and food trucks pay no tax. But, of course, food trucks pay some tax, and the city is obviously the one who decides how much tax they pay. And what that puts the court in the position of... But I'm talking about the commissary that they're attached to, they pay property tax as well. Is that not true? Yes, they do. Yes. Well, either directly if they own the commissary or if they rent space in the commissary through the rent. That's exactly right, Your Honor. And what that means is that since both groups have some tax burdens, that ruling in the city's favor would mean that in every instance legislators can, well, really just decide who they like better, justify that by saying, well, we think they are more important, they pay more in taxes, and that will justify the blatant discrimination against the newcomers. And the other rationale is that have there actually been any studies to show that the city's assertion that food trucks create sidewalk congestion or that any studies that the 200-foot encourages vendors to locate underserved areas? Is there any studies to that? Well, the city has committed no studies, but we did, Your Honor. And what those showed, there were two studies. But the city is using that as a reason for the rules. Well, Your Honor, what those studies showed is twofold. With regard to the congestion rationale that they put forward, it showed that the distance between a food truck and a restaurant had no bearing on congestion whatsoever. It also showed that the degree of congestion at food truck stands, those are big spots, versus other places where food trucks operate, there was no difference in that as well. So it showed that the city's congestion argument doesn't stand up to any empirical evidence. With regard to the retail food options, we did an exhaustive study to look at where food trucks go for over a year. And what it showed is that food trucks, even with the 200-foot rule in place, don't go to underserved areas. And that's not surprising because the 200-foot rule, it's important to remember, applies citywide, even in the underserved areas that the city ostensibly claims it wants to help. That means just a single 7-Eleven can turn an underserved area into a no-vending zone. Therefore, the rule makes it harder to vend in the very areas of the city that it claims to help. It doesn't make any sense. So, as I mentioned, the effect of the rule has been to decimate the industry, cause the number of food trucks to go down by 40%. As I mentioned as well, other state Supreme Courts, including the New York Court of Appeals, the New Jersey Supreme Court, courts in California and other states, they've all rejected municipal efforts to hobble vendors in order to benefit brick-and-mortar retailers. And if you affirm this, if you say that the government has this power to purposely discriminate, to hobble one industry for the direct financial benefit of another based on these incidental benefits, there's no stopping it. But Illinoisans' constitutional rights rest on firmer stuff. This court should honor a century and a half of precedent and follow the path set by Chicago Asylum Trust, Lazarus Church, and the other state Supreme Courts to hold that the city may not blatantly discriminate by hobbling one competitor in order to financially benefit another. Now, you mentioned before, Your Honor, about the city's other rationales, the congestion rationale. The city has before it two post-hoc rationales, and although the appellate court didn't consider them or didn't address them, I'll talk about them briefly. The first one is the pedestrian congestion argument they put forward. But I would submit that a rule that applies to just one business and is triggered only by the location of that business's competitors is not reasonably conceivable as a congestion measure. Moreover, Chicago Title and Trust shows the rule's arbitrary fit. Before, you were asking about Chicago Title and Trust. There, this court held that the rule was clearly unreasonable because it required 650 feet between stations and only 150 feet between schools and churches. This rule, likewise, requires 200 feet between a food truck and a restaurant and only 30 feet between a food truck and a sensitive congestion place like an intersection or a theater. I think my time is coming short, so I'd like to turn to my second issue, if possible, Your Honor, about the GPS. Now, Chicago's GPS requirement violates the Constitution. It's a warrantless search, and Chicago can't bear the burden of demonstrating it's reasonable. Counsel, I also see your light is on. In McElwain, this court stated that it's beyond dispute that conditions can lawfully be imposed on the receipt of a benefit, conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures, provided that the conditions are reasonable. How does that case impact your argument? Well, it only underscores our point, Your Honor, and that also goes along with this court's decision, Haley v. Brzezanski, which said a licensee is sent only to the reasonable and lawful conditions. An unreasonable search is not a lawful search. It's a constitutional search, and it's a search that the government can impose, even as a condition of licensure. In our briefs, we talk about cases where there are welfare benefits that can't be conditioned on unconstitutional searches. This is a search for two reasons. One, under the trespass theory of Jones. There, the U.S. Supreme Court said that when the government physically occupies private property to gain information, it's a search. In Chicago, it does just that. It's occupying private property by ordering my client to install a device on her truck so it can track its every movement. And when a search is conducted under the compulsion of sovereign authority, merit constitutional scrutiny. This also is a search because it violates the reasonable expectation of privacy, the long-term monitoring. In Jones, it's important to recognize that the members of the court felt that, particularly Justice Alito, felt that four weeks surely of monitoring surely constituted a search. Here, it's not four weeks. It's at least six months, pursuant to the city's own regulations. The city monitors not only where my client is at any given moment, but everywhere she's been for six months. That's a search that merits constitutional scrutiny. Now, I understand that the appellate court said that conditions of licensure meant that there was no constitutional scrutiny involved. I think that the Daily Versa Prisanti and McElwain show that, in fact, is not the case, and unconstitutional conditions cannot be imposed as a condition of licensure. Because this is a warrantless search, Chicago bears the burden of demonstrating its reasonableness. And that requires them to prove three things. One, that the search is in service of a substantial government interest. Two, that it's necessary. And three, that it's been adequately caverned. I see my time has elapsed. Just finish your thought. Okay. This fails, all three. First, the purpose to monitor in order to enforce the 200-foot rule is illegitimate. It's not substantial. Second, it's not necessary because the city has never used GPS tracking in order to conduct a field inspection when it says it's four. And three, as we began, the plain language of the ordinance requires that GPS data be shared with whomever asked for it. Thank you, Your Honors. Thank you. Ms. Luce. Good morning, Your Honors. I'm Susanna Luce. I represent the city of Chicago. May it please the Court. In this case, the Circuit Court and Appellate Court correctly rejected Ellen Hayes' constitutional challenges because the 200-foot rule is rationally related to several legitimate government interests, and the GPS requirement is not an unreasonable search. To begin with, the 200-foot rule, it satisfies a substantive due process. Of course, we are under rational basis of view here, so it will be upheld so long as there is a conceivable basis for finding that the ordinance is rationally related to a legitimate governmental interest. And we submit this 200-foot rule is rationally related to three such interests. The first interest is the balancing of interests of both brick-and-mortar restaurants and food trucks so that both can benefit Chicago. It's not a fair characterization at all what city council did to say that we were intentionally discriminating against food trucks. The 2000 amendments were quite clearly a balancing act between both. You can tell that by the terms of the ordinance itself. You can even tell that by the press release that my opposing council emphasizes in their briefs. On the one hand, city council has expanded the food truck industry by allowing food preparation on board and by creating food truck stands that actually reserve spots just for food trucks in the city of Chicago. The city council kept the 200-foot rule to mitigate the harm to the public benefits that are derived from the operations of brick-and-mortar businesses in Chicago. The purpose is not to suppress competition, but to protect the many benefits that brick-and-mortars do bring to Chicago. Tax revenue, jobs, they make a major contribution to tourism and bring cultural contributions to the city. Even LMT's expert, Dr. Aaron Floyd, talks about other initiatives, wider benefits that brick-and-mortars bring to the community, including contributing to security and sidewalk maintenance and curb appeal. These are all things that brick-and-mortar restaurants who are invested in property and developing their business in Chicago bring to Chicago, and it's an important concern in balancing the interest as we are expanding the food truck industry in Chicago. And this balancing is proper, even when some competition is suppressed. We cite several examples in our brief, General Motors, Yellow Cab, and co-decisions which involve governmental actions that did suppress competition, but nevertheless served important public interest in those cases by stabilizing an industry or protecting consumers or guarding against some sort of unfairness in competition. So we submit that even if competition is affected, even directly affected, this 200-foot rule serves a legitimate governmental interest of balancing the interests of the brick-and-mortar restaurants with the food truck industry. We also emphasize that this case involves a mobile business. Most of the cases LMT relies upon do not, like the Chicago Title and Trust, Cosmopolitan National Bank, and Exchange National Bank, do not involve businesses operating on the public way. If they involved a gas station, a restaurant, and a car wash on Harvard property. Had those cases involved a mobile gas station, for example, or a mobile car wash operating in the street, they may well have turned out differently. Public way cases are more analogous here. Cases like AAA and Mundelein, Good Humor versus Mundelein and Rhyme. In those cases, business operations in the area that were on the public way were in an area, obviously, that is first and foremost used for transportation and pedestrian traffic. And this presents greater opportunities for congestion and for negative impacts on the abiding brick-and-mortar property that this court recognized in AAA. And again, my opposing counsel describes the 200 rule as incidentally bringing benefits to the public. But we submit this is a rational basis review, and here the public benefits are not incidental to the governmental purpose. They are the governmental purpose. And turning to the second legitimate rationale for the 200-foot rule is controlling congestion on the public sidewalk and in the public way. That is a real concern. It is an obvious concern. Have you done research on the statistics of the congestion since the food trucks have been in existence? We do not have food trucks on the precise statistics of how many people specifically are encumbered by food truck congestion, but there really is no question that food trucks do bring congestion to city sidewalks. It's the nature of the business, and even L&P's own expert study shows this. There were numerous instances in that case of food truck lines going out to the sidewalk, interrupting pedestrians who were walking through. There's really no question that. The lines have to be on the public sidewalks when the trucks are parked next to the public sidewalk, and the lines stand out. There are people who are waiting for their food. I don't even see my opposing counsel disputing that there is, in fact, congestion concern that arises with food truck operations. But still, the ordinance allows food trucks within, what is it, 20 or 30 feet of the crosswalk or an intersection, and within 20 or 30 feet of the entrance to a theater where there's congestion, maybe more congestion than at a restaurant? Well, not all congestion sources are treated the same, and so the 200-foot rule is not necessarily appropriate for all of them. But having the 200-foot rule only for restaurant number one opens more opportunities at other locations for food trucks. But the location near restaurants is unique because restaurants and food trucks have the very same busy times, breakfast, lunch, and dinner. And also, restaurants have sidewalk cafes often, and that eliminates some of the space on the sidewalk. But doesn't the sidewalk cafe cause congestion for pedestrians as well? And they're allowed to be on the street. They're allowed, and they have certain restrictions about how far out into the sidewalk that they can go. So that's an example of part of the balancing here. The whole burden shouldn't all be on the brick-and-mortar restaurants to control congestion, but we certainly do address those congestion issues also. And some of the other examples, theaters, for example, they may involve a big crowd right when the show is about to start for a shorter period of time, and not that they don't tend to have the same exact busy times as food trucks on a regular basis. Is there a restriction about lining up to buy tickets during the day, or if there's a sale at a store, people line up on the street for that? Are there restrictions for those situations that cause congestion on sidewalks? I'm not sure about those. I don't think so for those particular line situations, which are less frequent in the retail non-food situation. And with respect to my opposing counsel emphasizes that this rule applies even to food trucks operating on private property. We submit the city can rationally believe that the 200-foot rule helps avoid congestion when they're operating on private property, too. There's testimony from Deputy Commissioner Lou Anne Hamilton explaining how food trucks still have every incentive to park close to the public way. Could the city constitutionally ban food trucks? This court upheld the ban on street vending in the Good Humor v. Mundelein case, and I don't understand my opposing counsel to dispute that, and that's not been a rule. So, yes, certainly a ban on street vending would be rationally related to addressing congestion concerns, for one, but even beyond that ban here, it's something very different. This isn't balancing. This isn't welcoming the food trucks at the same time as trying to control some of the obvious concerns presented when food trucks are operating on the public way. Could you just address the issue that counsel says, that none of these arguments really are what's motivating this statute, that the purpose of the statute is to hobble a competing industry? That is simply not true. There is no statement anywhere. There's nothing in the legislation to suggest that what we're trying to do is to hobble a food truck industry. Not only that, but the food truck industry is doing quite well. There are 120 licensed food trucks in Chicago, and even LMP's owner has acknowledged that she hasn't had any trouble operating in the loop in 10 different locations and even being able to let people know what that location is going to be ahead of time. Their own expert, Dr. Butler, counted some 3,000 food truck stops within a year's time in the loop. So we submit that that is not at all remotely the reason. Of course, there are several rational bases for the legislation that jump out and are sufficient to uphold the 200-foot rule. Briefly, I wanted to address Professor Ehrenfeucht's study. My opposing counsel mentioned that, according to her study, there is no difference in congestion when you're within 200 feet of a restaurant and beyond 200 feet of a restaurant. But what she doesn't say, even accepting her conclusions, she does not doubt that food trucks contribute to congestion. There's a heavier amount of pedestrian traffic, and that's exactly why LMP wants to park in those locations. So there will be less congestion at least at these locations when there are no food trucks there. The city does not have to decide to eliminate all food truck congestion in the city or eliminate none. Well, doesn't that study then show that if there's no congestion in an area, the underserved area, then why is it applying to those areas? The 200-foot rule. The 200-foot rule applies to – I'm sorry. Well, if there's no congestion in underserved areas, then why is that rule applied there in underserved areas? Why is it citywide? Well, it serves other interests. And, of course, the congestion is a general problem across Chicago, and sometimes in other areas you have smaller sidewalks. So there could still be a congestion problem, even if it's not the same kind of traffic as downtown Chicago.  The rule still survives rational basis review because it's certainly rational to believe that the 200-foot rule will have an effect on congestion in Chicago, particularly in the areas where food truck operators most want to operate, the congested areas of downtown Chicago. I'd like to move on to the third reason for the 200-foot rule, which is to incentivize food trucks to go where there are less food options. This purpose is served to submit whatever food truck complies with the rule because, by definition, the food truck will be parking where there are no restaurants within at least 200 feet. But beyond that, there are some food trucks that are going to underserved communities. Again, Dr. Butler's Twitter analysis, that's a plaintiff's expert, he counted food truck stops. Many of them were in downtown Chicago, but some were in Inglewood, and South Shore, and Beverly, and Humboldt Park, areas that have been identified as underserved communities. And a food truck operator, Daniel Herrera's testimony is telling in this regard. He perceives Hyde Park to be an area that has demand but not enough food truck options, and he doesn't want to deal with the park and the 200-foot rule that comes with operating in the more congested areas of downtown. His own motivations show that the 200-foot rule can and does encourage at least some to branch out to other places where there's a demand that is not being met. For these three reasons, we submit that the 200-foot rule is rationally related to these three legitimate governmental objectives. And I'd like to turn my attention now to the GPS requirement. The food trucks are required to have a GPS device and turn them on while operating or being serviced at a commissary. We submit that this requirement is not a search. It is not our position that entities are not protected by the Illinois Constitution or the Fourth Amendment. It's our position that the GPS requirement in and of itself is not a search. It's essentially a record-keeping requirement, like in the California Banker's case. It's not a search to require business to keep records in case the need arises for legitimate regulatory purposes. It is not the case, as my opposing counsel states, that we track every move of the food trucks, that there's constant monitoring going on. There's nothing in the ordinance that suggests that is required, that that is happening. And it's clear that the rule is about licensees obtaining and keeping information that unquestionably relates. What kind of records do you keep with regard to where the trucks go? I mean, do you keep records that these trucks are actually in underserved areas and how many of them and for what hours and when? And do you publish those records and those statistics online so people would know, the public would know, what is being monitored by the GPS that's a requirement of the license? Well, we do. We actually haven't accessed the GPS data to date. We do not keep the information. It is not sent directly to the City of Chicago. It is not required to come to the City of Chicago. It is required to be maintained by the GPS provider of the food truck operator's choice, who is required to then keep the information for six months. What is the information they keep? They keep the GPS coordinates for the location of food truck operators whenever it's turned on and whenever they're at the commissary. And then there are rules about when they would get into the city. Those are in the Department of Health food truck rules, rules that plaintiff does not contest, challenge, and those rules limit the occasions in which the City of Chicago would request and obtain that data, things like that. The city does request the data? It can under its rules. It has not to date requested the GPS data, but it can for purposes of inspections or in the event of compliance, to show compliance with regulatory rules that are challenged here. And most importantly, in the event of an emergency, the city can reach out to the GPS provider and find the most up-to-date location information, because after all, every business in the City of Chicago gives its business operating address to the City of Chicago, and there's no reason why the mobile food truck industry should be exempt from such a requirement. This is, after all, a food industry, and emergencies can arise. It is a heavily regulated industry. If the city wants to locate or access a food truck's location, what do they have to do? Well, then they would have to reach out to the GPS provider, and they could, at the rules contemplate, they could ask for consent. Consent from the food truck? From the food truck, yes. The rules contemplate that sometimes there might be a subpoena or a warrant. It depends on the situation. There are other situations when an inspector may be going out to conduct an inspection that is required under the various rules for the food industry. In my court, you're saying that safety or sanitary regulations apply to the trucks, and that inspectors need to have an opportunity to inspect the trucks. Is that what you're saying? Yes, absolutely. And sometimes it can be difficult. Obviously, we're dealing with a business that moves from place to place at least once every two hours under the ordinance, and it can be difficult to find a moving business. And so this is the way that the city council has found to do that. Is this more than just logging on to your computer? I'm sorry? Is this more required than just logging on to a computer and checking? Are you talking about from the city standpoint? Yes. The city would have to contact the GPS provider and be provided that information. The city does not have direct access to that information. And that brings me to the issue that my opposing counsel raises about the publicly accessible application program. Counsel, before you get into that, I wanted to ask a question about, is that cost for the GPS the burden of the licensee? Is that borne by the licensee so they have to pay for it? Yes, it is, as is other equipment that regulated businesses are required to have. The ordinance requires a publicly accessible application programming interface. And I'd submit that the very dictionary definitions that LMP relies upon in their reply brief on page 23 shows that accessible means capable or possible, which is consistent with what the Department of Health rules say, that this is about a technical capability. It's not about requiring public access, nor is it about requiring direct access to the city. In fact, the rules make it clear that that is not required. So we submit this is not a search. It's a record-keeping requirement. It's not a search under the Jones and Grady cases because those cases involve physical intrusions onto government property and accessing information for the purpose of constantly monitoring, as was the case in Grady. Counsel, with regard to accessibility, do caterers have to notify the city or is that under their licensing where their event is going to be? And do inspectors have access to the place where the caterers actually do their events? It's a similar situation? I believe there is a mechanism for finding where the caterers are serving, but I don't offhand know exactly what that is. I'm happy to look into that further. If there are no other questions, would you ask that the judgment of the appellate court and the circuit court be affirmed? Thank you. Thank you. Reply. Thank you, Your Honors. I wanted to start with the 200-foot rule, and specifically a statement made by a colleague regarding my client's operations. She said that my client is operating in the city of Chicago, and that's not true anymore. The 200-foot rule made it so difficult for her employees to find places to park, legal places to park, that she has largely withdrawn her trucks from the city and no longer operates there. And that is consistent with the history of this case. The number of food trucks has gone down by 40%. My original client in this case, my original client, Greg Burke, the owner of the Schnitzel King, because the 200-foot rule wasn't able to survive and had to leave the state to find other employment, this rule has had a devastating effect on the industry. Now, with regards to private property, I understand the city had some speculation that, well, maybe food trucks on private property would want to park near the sidewalk. But, in fact, their own expert observed food trucks operating on private property and noted that there was absolutely no interactions with the sidewalk whatsoever. There was no congestion of that from food trucks operating on private property. And that makes sense. With regards to congestion, they point out that food trucks can have lines sometimes. And, of course, that's true. I wouldn't disagree with that. But almost everything in Chicago, almost every activity in Chicago causes congestion. That's why Chicago has broad-based rules to deal with congestion. Contrast that with this rule. The 200-foot rule only applies to food trucks. And it just so happens to only apply to the people who feel a competitive threat with food trucks. So, this law, even if congestion at a theoretical level is a legitimate interest, and, of course, it is at that level, having a law that applies to just food trucks and restaurants is constitutionally arbitrary. The point about the sidewalk cafes, I thought it would, the sidewalk cafes, with regards to sidewalk cafes, the city has regulations in place for the precise purpose of preventing sidewalk congestion issues at sidewalk cafes. They require them to maintain a minimum sidewalk distance precisely for that purpose. They can't bootstrap that into another rule to allow them to push my clients away. And this argument that, well, restaurants are different than the host of other activities that food trucks can operate within 200 feet of because they get busy at the same time. Well, that's exactly why we measure. Our study went and looked at the degree of congestion that caused between food trucks and restaurants at lunchtime. We did that precisely to capture that effect. And the whole thing still stands that there's no difference in congestion outcomes based on the distance between a food truck and a restaurant, even at lunch. My opposing counsel also talked a little bit about the retail food options justification that they put forward. She noted that the study found that some food trucks happened to go into underserved areas. This study covered 140 trucks for over a year. The total number of observations, I can't tell you, is over something around 15,000. There were 34 stops in underserved areas over the course of the entire year. My expert, when he testified, said, they go there so rarely, it almost seems like they're getting lost when they show up. And the city also says, oh, about Hyde Park. Well, Hyde Park is underserved. But their own studies, their own work, shows that the area where the food trucks actually congregate at the University of Chicago in Hyde Park isn't underserved, it's actually over-served to the tune of something like $4 million per year. So none of their arguments bear the weight of scrutiny. And that's exactly what, even under the reasonably conceivable standard, you still look at evidence and you say, does this make sense? When I look at the facts and circumstances and evidence, does this make sense? And we have adduced evidence that we believe shows that this has no legitimate purpose and that its only goal is to balance the interests, which is, at the end of the day, is nothing more than the euphemism for protecting restaurants, which the mayor admitted. The mayor said that this rule exists to protect traditional restaurants from food trucks. It's in our brief. It's at page 114 of the appendix. That that has no rational relationship to any legitimate interest. The New York Court of Appeals held that. New Jersey Supreme Court held that. Courts in California have held that over and over again. Courts, when they've been presented with a law like this, that deliberately hobbles, kneecaps, burdens one competitor in order to financially benefit another one, those courts have struck that down. Now, turning to the GPS issue, there are a few points there. The city says that, oh, well, the publicly accessible part of the GPS, the fact that you have to have a publicly accessible door, well, this is just technical. The mayor's words betray that. The mayor said in a press statement that the GPS was being mandated so the city and consumers can follow their locations. It was always contemplated that not just the city would have access to this, and that's at page 117 of our appendix, not just the city would have access to this, but anyone who asked. And, in fact, my client's GPS service provider, in deposition, said that because of the ordinance's language, he felt he could not refuse a request for access from the public. And, in fact... Can you tell us about the ordinance in terms of that? Does the ordinance set out when someone can request, the city or anyone else, can request the information? No, it does not, Your Honor. That is all in the regulations. So tell me about the regulations. What do they say? The regulations state, well, up until the recent change, the regulations stated that they could use... that it was a publicly accessible API, and they recently changed the regulations again, three weeks ago, to say simply that there's no need to give the public access to your publicly accessible API. But the plain language of the ordinance, coupled with the words of the mayor, demonstrate that it was always contemplated that this was supposed to give broad access to the public. And, in fact, my client's GPS service provider did give access to one person who requested it. So there's... requires public access, the plain language of the ordinance. The city admitted never using the GPS data once in six and a half years. Under the Fourth Amendment article in Section 6, jurisprudence, is there a burden to show it's necessary? How can something be necessary if it's never been used for its ostensible purpose in six and a half years? Why does my client need to bear hundreds of dollars a year in costs, have this device forced upon her in her vehicle, served for goals that they never even used it for? As an aside, I believe my opposing counsel said that we didn't challenge the regulations. We, in fact, did for our partnership lawsuit. This idea of recordkeeping, this is merely a recordkeeping requirement, as we noted in our reply brief, doesn't stand up to scrutiny. In Oklahoma Press Publishing v. Walling, the U.S. Supreme Court rejected a subpoena for business records, which was being challenged on Fourth Amendment grounds, and it said, well, there hasn't been a search here because no officer or other person has sought to enter the petitioner's premises against their will to search them. But that's exactly what's happened here. The city of Chicago is mandated under its sovereign authority that if you want to exercise your right to practice your trade, you're going to have to stick this GPS device in your vehicle so we can follow you and monitor where you are whenever we want. Is it your position that the rules, especially Rule 8, helps protect the constitutionality of the ordinance or undermines it? The Rule 8, I believe it... I believe it actually undermines it, Your Honor. I see my lights on. Because, again, they say it lays out the reasons for why they can request GPS data. And first and foremost, it's to enforce compliance with that chapter, which is where the 200-foot rule resides. So it expressly says you can use this for the 200-foot rule. And the ordinance's language  for purposes of enforcing this chapter, we're going to presume that you were at the place that your GPS data indicated. There's no reason for that other than you want to enforce a location restriction like the 200-foot rule. That's illegitimate, and that's unconstitutional. Thank you, Your Honors. Thank you. Case number 123123, LMP Services v. City of Chicago will be taken under advisement as Agenda Number 10. Mr. Cromer, Ms. Loos, thank you for your arguments this morning. You are excused.